UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| STEVE ANCTIL, JR., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 1:16-cv-107 |
| | ) | |
| JOSEPH FITZPATRICK, et als., | ) | |
| | ) | |
| Defendants | ) | |

**MOTION FOR SUMMARY JUDGMENT**

Pursuant to F. R. Civ. P. 56(a), defendants move for summary judgment in their favor on all claims in this action. As grounds for this motion, defendants state that there is no dispute as to any material fact and that, on the facts of record, defendants are entitled to judgment as a matter of law.  Specifically, defendants state:

1.  As a matter of law, defendants Fitzpatrick, Bouffard and Liberty are not liable for alleged interference with plaintiff's legal mail.

2.  As a matter of law, defendant Troy Ross is not liable to the plaintiff on plaintiff's claim that he failed to protect plaintiff from an assault by another prisoner.

**MEMORANDUM IN SUPPORT OF MOTION**

**Facts and Procedural Background**

Steve Anctil, a prisoner incarcerated at the Maine State Prison, brings two separate claims against officials of the Maine Department of Corrections.  First, Anctil claims that department staff have repeatedly interfered with his legal mail by opening it outside of his

1

presence and refusing to send outgoing mail.  Secondly, Anctil claims that, despite telling staff that he did not feel safe in the C-Pod housing unit, he was transferred there from a different pod and was assaulted by another prisoner a week later.  He claims that defendant Troy Ross, the deputy warden of the prison, failed to train staff adequately, resulting in the assault.

## 1.  Legal Mail Claims

The Department has in place a detailed policy regarding the handling of legal mail. Pursuant to that policy, prisoners in general population send outgoing mail by placing it in locked mailboxes (similar to the Postal Service mailboxes on public streets) that are placed in areas that prisoners pass several times a day on their way to chow.  Only mail room staff  have keys to these mailboxes. Mail is collected from these boxes around 10 a.m. each day, except weekends and holidays.

Prisoners in restricted housing (Special Management Unit, Infirmary, Administrative Control Unit and Structured Living Unit) have their mail collected by officers in their unit, who collect the mail in locked, plastic boxes (similar to fishing tackle or tool boxes with slots in the top). Only mailroom staff  have the keys to these boxes. These boxes are brought to the mail room, usually by 10 a.m., where they are unlocked and emptied by mail room staff.

Prisoners who do not have postage stamps or who must send an item by certified mail must request that funds be transferred from their prison trust accounts to pay for postage.  They do this by attaching a transfer request slip to the mail and giving it to a designated officer in their housing unit.  When the mail is delivered to the mail room, staff weighs the mail to determine the amount of postage required and then sends the transfer slips to the business office, where staff debit the prisoner's account and return it to the mail room.  Mail room staff then affix the appropriate amount of postage.

Prisoners are given sufficient free postage for two one-ounce letters per week.  If a prisoner has no funds in his account, the business office will note this on the transfer slip, return the outgoing mail to the mail room, and the mail room will return it to the prisoner.

If a prisoner has no funds in his account, the Department will pay for postage for outgoing legal mail.  The processing of requests for free legal mail is the same as the transfer slip process described above.  The business office determines whether the outgoing mail is "legal mail" and qualifies for free postage.

Except for Saturdays, Sundays and holidays, outgoing mail is usually collected, processed and delivered to the post office the same day.  Delays occasionally occur, such as when mail room staff are diverted to assist in a security incident, the facility is locked down, or the volume of mail is particularly high.  In those instances, the mail will go out the following weekday.

All incoming prisoner mail is processed by the mail room. The outside of the mail is inspected for a legible return address.  Regular mail is opened and inspected for checks, money orders or contraband.  Checks and money orders are diverted to the business office for deposit in the prisoner's trust account.  There are detailed procedures for handling mail containing contraband or other unpermitted items; these are set forth in DOC Policy 21.2, Prisoner Mail.  Although the mail room staff opens and inspects incoming mail, they are not permitted to read the mail.  Any surveillance of incoming mail for security purposes is done by the SII unit with the approval of the Warden or his designee, and mail may be diverted for that reason.

A special rule applies to incoming "privileged" mail. As pertinent to this case, privileged mail is correspondence concerning a legal matter or official government business between the prisoner and an attorney, judge, court clerk or court, the Maine Human Rights Commission,

appointed and elected government officials, advocates of government agencies and legal advocacy organizations. It is treated as privileged only if it is in an official envelope with a verifiable return address and was clearly sent from a privileged correspondent. If it appears from a visual inspection of the envelope that the mail is legal in nature, the mail is not opened in the mail room. It sometimes requires some judgment to determine whether a particular letter is legal mail. For example, if a letter is from a state agency such as OPEGA or the Secretary of State, unless the name of a particular individual appears in the return address, the mail is not considered "legal."

Legal mail is delivered unopened to the prisoner's housing unit where the shift supervisor or a designated officer will call the prisoner to his or her office and open and inspect the mail in the prisoner's presence. The prisoner is then required to sign a log or receipt indicating that the mail was opened in his presence and delivered to him.

Non-legal mail is opened in the mail room using a machine that runs the envelopes along a conveyor and slices them open. On occasion, a piece of legal mail will accidentally be opened in the mail room. This can occur when two pieces of mail stick together and are run through the opening machine, when it cannot be determined from the return address on the envelope that the mail is legal in nature, or from simple inadvertence when a large volume of mail is processed. When legal mail is accidentally opened in the mail room, a notation is made on the envelope advising the prisoner of that fact. The mail room staff do not read the mail.

Eric Wildes, the mail room supervisor, is familiar with prisoner Steve Anctil and has been involved with responding to some of his complaints about his legal mail. He recalls the following instances:

- On April 24, 2015, Anctil complained about receiving a package from the Maine Human Rights Commission that was taped closed.  There was no indication that the package had not been received in that condition or that the mail room had opened it and then taped it closed again.

- On October 19, 2015, Anctil complained that a letter from the Maine Volunteer Lawyers' Project had been opened outside of his presence.  Inspection of the envelope showed that the return address (specifically the words "Lawyers' Project") was partially obscured by a white bar code label that had been affixed to the envelope, so that the mail was not identifiable as legal mail.

- On November 24, 2015 a letter from the state Office of Program Evaluation and Government Accountability was opened outside Anctil's presence.  The mail room staff did not consider this legal mail, and it was later determined that mail from OPEGA would not be considered privileged unless the return address included the name of the director or one of the OPEGA committee members.

- On December 14, 2015, Anctil claimed that unit staff had removed a piece of his outgoing legal mail from the SMU mailbox.  (There was no indication that the mail was opened or read or not brought to the mail room to be sent out.)  Anctil was advised that the SMU mailbox is locked and only mail room staff have the key.

- At one point, the mail room received a complaint from the local post office that a couple of its employees had sustained injuries as the result of staples being left in outgoing prisoner mail.  This was the result of prisoners (or staff) stapling transfer slips to the envelopes rather than using tape or paper clips.  Staff and prisoners were advised not to use staples on outgoing mail,

or the mail would be returned.  Despite this, Anctil persisted in using staples, and several pieces of outgoing mail were returned to him for this reason.

- On April 3, 2016, a letter from Anctil to the United States District Court was returned as undeliverable.  Mail room staff mistakenly opened the returned letter outside of Anctil's presence (but did not read the letter.)  This was inadvertent.

Because Anctil is indigent, the business office is requested to approve free postage for legal mail he wishes to send.  Between the end of July and the end of December, 2016 (the period covered by Anctil's amended and supplemental complaints), the business office approved payment of postage for eighty-four pieces of outgoing legal mail from Anctil.

The business office does not keep a record of a transfer slip requesting free postage if it is determined that the mail is not legal mail; the transfer slip is merely returned to the prisoner. Although there is no record of the number of times a request for free legal mail was refused, Anctil filed five grievances with the business office for refusals to pay postage for his outgoing mail.

According to the database of the Litigation Division of Office of the Attorney General, in addition to this case, Anctil is currently or has recently been the plaintiff, petitioner or complainant in nine separate legal actions against the Maine Department of Corrections, its employees, or other state agencies.

### 2. Failure to Protect Claim

On March 29, 2014, Anctil was housed in C-pod of the Close Unit at MSP.  On that date, Sgt. Kevin Cox observed that Anctil had a black eye. On being questioned, Anctil told Sgt. Cox that the injury happened during a basketball game and was an accident.  Anctil assured Cox that there were no safety issues for him in the pod and that he got along with all the prisoners in the

pod. However, at the request of the medical department, Anctil was isolated until x-rays could be taken to determine whether he had sustained an orbital fracture and also to determine if he was safe in population.  Anctil was placed on Emergency Observation Status in a cell in A-pod the same day.

Anctil continued to reside in A-pod for several months.  On September 11, 2014, Anctil was transferred back to C-pod.  On September 18, 2014, Anctil was assaulted without warning in the C-pod dayroom by his cell mate, prisoner S.C., by means of a belt to which two padlocks had been tied.  A subsequent investigation suggested that the two prisoners had fought the night before in their cell, as Anctil had a minor stab wound in his shoulder and S.C. had what appeared to be a razor slash across the left side of his face.

After Anctil's mother called the prison to complain about the assault on her son, Dwight Fowles, the Department's Intelligence/Fugitive Coordinator, was assigned to investigate the matter. He interviewed Anctil on September 29, 2014 at MSP.  Anctil had two complaints about the incident.  First, he had a complaint against one of the officers who was present and responded to the incident.  His second complaint was that Unit Manager Mendez placed Prisoner Anctil in Close C-pod after Anctil brought it to the attention of staff that he had previously been assaulted in Close C-pod.

With regard to the complaint against U.M. Mendez, Anctil said that he had not spoken directly to U.M. Mendez about his concern, but had only spoken with the pod officer.  He was unable to identify the officer he spoke with.  Anctil stated that the persons who had previously assaulted him were no longer in C- pod. Anctil stated that he said there were no specific prisoners in C-pod that he was aware he was going to have problems with.

Anctil denied that he had any problems in C-pod after he moved in prior to the assault. He said that his cell mate initially did not want to live with him because the cell mate heard that Anctil had informed on some other prisoners.  Anctil stated that he and his cell mate had worked things out, and that he did not report any problems to staff prior to the assault. Anctil stated that the assault had come as a complete surprise.

After spending some time in the infirmary, Anctil was transferred to Close F-pod.  The Close Unit Manager, Antonio Mendez, placed a Level II "keep separate" notification on Anctil and S.C. in the prisoner database, requiring that they be housed in different pods.  S.C. was kept in Close C-pod.  Although they are housed in different pods, prisoners in the Close Unit occasionally may interact with each other, specifically during prisoner movements to meals, jobs and activities.

On November 4, 2014, Anctil and S.C. were involved in a fight in the hallway between Close C-pod and F-pod.  It does not appear from the report of this incident that Anctil sustained any injury in this fight.

In his capacity as Deputy Warden, defendant Ross is not responsible for training security staff at the prison.  Officers receive their initial training in a six-week course administered by the Maine Criminal Justice Academy, and additional training is provided informally on the job and formally by the Department's training staff.

Ross was not involved in the decisions regarding Anctil's housing placements in 2014. Decisions about where to place prisoners within the Close Unit were made by the unit management team as led by the Unit Manager and the Shift Commander.  At that time, Antonio Mendez was the Close Unit Manager and Capt. Kenneth Vigue was the Shift Commander. Ross

believes each of these men had worked at the prison for several decades at the time of these incidents, and each was very experienced in security practices.

The somewhat complicated procedural history of this case is explained in the court's Order Affirming in Part and Rejecting in Part Recommended Decisions of the Magistrate Judge (ECF No. 68). In sum, the court has allowed the following claims to proceed:

1. Claims of inadequate access to the court only insofar as they pertain to defendants' alleged failure to properly handle plaintiff's incoming and outgoing legal mail pertaining to plaintiff's efforts to challenge the conditions of his confinement.

2. The claim against defendant Ross for an alleged failure to protect (based on failure to train).

*Id.*, pp. 13-14.

## Argument

**1.  As a matter of law, defendants Fitzpatrick, Bouffard and Liberty are not liable for alleged interference with plaintiff's legal mail.**

In *Lewis v. Casey*, 518 U.S. 343, 349 (1996), the Supreme Court emphasized that, to succeed on a claim that the policies or actions of prison officials were impeding a prisoner's constitutional right of access to the courts, the prisoner must show an actual injury resulting from the action or policy. The court elaborated on this holding in *Christopher v. Harbury*, 536 U.S. 403 (2002). There, it recognized that access-to-court claims may involve frustration of the right to bring some future action due to the operation of a governmental policy or practice, or the loss of an existing meritorious claim due to some specific action. *Id.* at 414. The court re-emphasized the "actual injury" requirement of *Lewis*, stating, "Whether an access claim turns on

a litigating opportunity yet to be gained or an opportunity already lost, the very point of recognizing any access claim is to provide some effective  vindication for a separate and distinct right to seek judicial relief for some wrong." *Id.,* 414-415.  Thus, to succeed in an access claim, the plaintiff must identify a non-frivolous, underlying claim that has been frustrated or lost by the defendant's interference with plaintiff's access to the court.  *Id.*  The underlying cause of action and the lost remedy must be identified by allegations in the complaint.  *Id., 416.  C.f.*, *Goodrich v. Ouelette*, 2010 WL 3516608 (D. Me.) (requiring an "actual, tangible interference" with a court proceeding); *Barry v. Cumberland County Jail*, 2016 WL 2937456, *5 (D. Me. 2016) (plaintiff must demonstrate that he suffered prejudice as the result of the opening of his legal mail.)  The right of access to the courts addresses only a prisoner's right to attack the conditions of his confinement. *Riva v. Brasseur*, 2016 WL 9650983, *1 (1st Cir. 2016); *Bass v. Singletary*, 143 F. 3d 1442, 1445 (11th Cir. 1998) (limiting access-to-courts claims to appeals from convictions, habeas petitions, and civil suits.)

Nowhere in his amended and supplemental pleadings does Anctil identify a single instance in which alleged interference with his mail caused a default, dismissal or other loss of a tangible and non-frivolous legal claim.  Additionally, although he repeats the conclusory mantra that his mail related to "conditions of confinement claims," he has not provided any factual support for these assertions.[1]

Also absent from Anctil's pleadings is any indication of the involvement of the named defendants in the alleged interference with Anctil's mail.  The facts alleged do not support the conclusion that the named defendants supervised or directed the activities of the mail room staff, the business office, or the line staff involved in delivering prisoners' mail, nor do the pleadings

---

[1] It is clear that this lawsuit at least in part concerns the conditions of Anctil's confinement; however, it is also apparent that none of the alleged instances of interference with mail to or from this court has affected any claim in the case.

indicate that the named defendants directed or condoned the alleged acts of interference. *See, Davis v. Goord*, 320 F. 3d 346, 351 (2d Cir., 2003) (plaintiff must allege that the defendant took or was responsible for actions that hindered his efforts to pursue a legal claim) (citations and quotation omitted); *Brown v. Dept. of Corrections*, 2016 WL 6678921 (D. Me. 2016) (complaint dismissed on preliminary review where plaintiff does not allege that any particular defendant has engaged in mail-related conduct.)

Anctil's primary complaint against these defendants appears to be that they did not respond to his satisfaction to his many grievances about the mail. This complaint, however, does not implicate any constitutional right. *Leavitt v. Allen*, 1995 WL 44530, *2 (1st Cir. 1995) (due process clause does not create a substantive right to a grievance process, and failure to properly investigate a grievance does not support a constitutional claim.)

The record does establish that the Department has developed a formal policy and implemented at MSP procedures designed to comply with all constitutional requirements affecting prisoner mail.  To that extent, these supervisory officials have discharged their constitutional obligation.

With regard to alleged instances of interference with his outgoing mail, the majority of Anctil's claims are that "various staff" refused to allow him to send mail.  Aside from not identifying in most cases the individuals who supposedly interfered with his mail privileges, Anctil does not elaborate on what constitutes a refusal to send out mail.  Was the mail deposited in the mailbox on a weekend or a holiday, or after the time designated for pick-up, so that it was not sent out until the next day?  These are restrictions that would affect Anctil if he mailed a letter in downtown Portland and certainly do not demonstrate a constitutional infirmity with the prison mail system.  It is also established that outgoing mail was returned to Anctil on several

occasions because he failed to remove staples from it after being told to do so.  As pointed out above, Anctil has not explained how any of these "refusals" has affected his ability to pursue a legal claim.

Anctil does identify seven instances in which the business office allegedly "refused" to send out his mail. Motion to Supplement (ECF No. 46), ¶¶ 9, 12, 14, 27, 36, 79 and 91.  The record establishes that what the business office refused to do in those instances was to approve *free* postage to Anctil, after they determined that the mail he was asking to have sent out for free was not "privileged mail" as defined in the Department's mail policy.  What constitutes privileged mail under the policy is a much broader class of correspondence than that considered protected by the Constitution and, to the extent that Anctil claims that the decisions of the business office violated the prison mail policy, he has not raised a constitutional issue. Moreover, as Anctil had the ability to use the free postage allotted to him weekly under the mail policy to send out non-legal mail, the refusal of the business office to approve free postage on those occasions did not constitute interference with his outgoing mail.

The number of instances where Anctil claims interference with incoming mail is far fewer.  Many of these involve claims that mail sent by a court was opened outside Anctil's presence. Inmate rights are not violated when incoming mail from the courts is opened outside the presence of the inmate.  *Arbing v. Page*, 1993 WL 113711, *2 (7th Cir. 1993).  "Whatever secrecy the first amendment creates, it creates none in mail from the courts.  Documents generated by a court are open to the public." *Jones v. Edgar*, 1994 WL 387976 (7th Cir., 1994); *Keenan v. Hall,* 83 F. 3d 1083 (9th Cir., 1994).  Thus, to the extent that Anctil is claiming that his incoming legal mail sent by a court was opened outside his presence, he fails to make out a claim of unconstitutional conduct.

"Although a prisoner has a right to be present when his legal mail is opened, an isolated incident of mail tampering is usually insufficient to establish a constitutional violation." *Davis v. Goord*, 320 F. 3d 346, 351 (2d Cir. 2003).  A court will generally require a showing of invidious intent or actual harm where incidents of tampering are few.  *Id.*  The record in this case negates any inference from the relatively few instances[2] when Anctil's incoming legal mail was opened outside of his presence that such occurrences were other than inadvertent; moreover, there is no indication that staff read any privileged legal correspondence.  As argued above, where Anctil's complaint involves a disagreement with mail room staff over whether a particular piece of correspondence falls under the definition of privileged mail in the policy, absent facts to show that the correspondence concerned a legal claim challenging conditions of confinement and the loss or impairment of that claim, Anctil has failed to raise a constitutional issue.

Finally, to the extent that the court recognizes a free-standing right of prisoners under the First Amendment to send and receive mail, the record dispels any notion that Anctil has been chilled in the exercise of that right.  The number of the complaints enumerated in his pleadings, representing as they must only a fraction of his postal activity, the documented number of approvals of free postage during a period covered by his complaints, and the number of legal actions he is currently or has recently engaged in, all demonstrate that, whatever problems he claims to have experienced with the prison mail system, he has not been discouraged from employing the system to pursue his legal claims.

---

[2] The incidence of alleged interference with his mail must be viewed in the context of the unusually large amount of mail that Anctil sends and receives.  *See*, Affidavit of Vonda Faxon, ¶ 2 (business office approved free postage for 84 pieces of outgoing legal mail in five month period.)

**2.  As a matter of law, defendant Troy Ross is not liable to the plaintiff on plaintiff's claim that he failed to protect plaintiff from an assault by another prisoner.**

Prison officials can be held liable for failing to protect an inmate from assault by another inmate only if they are deliberately indifferent to a known risk of serious harm.  *Farmer v. Brennan*, 511 U.S. 825 (1994).  Under the Supreme Court's formulation, to be found deliberately indifferent, "…the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

 *Id. at 842.*  Plaintiff must show that defendants "…are knowingly and unreasonably disregarding an objectively intolerable risk of harm." *Id. at 846.*   Reasonable measures taken to avert a known risk will insulate a prison official from Eighth Amendment liability, even if those measures proved unsuccessful.  *Farmer v. Brennan, supra,* at 844;  *Bagola v. Kindt*, 131 F. 3d 632, 646 (7th Cir. 1997).

"Prison officials cannot be indifferent, of course, if they are unaware of the risk…" *Burrell v. New Hampshire,* 307 F. 3d 1, 4 (1st Cir. 2002).  Where plaintiff himself testified that he was totally surprised by an attack, defendants had no reason to know that plaintiff was in any danger and thus could not be held liable for failing to prevent the attack.  *Hopkins v. Britton*, 742 F. 2d 1308, 1310 (11th Cir. 1984);  c.*f., Gamache v. Merrill*, 2011 WL 4005319, *5  (D. Me. 2011) (no knowledge of serious risk where officers aware only of a vague, anonymous threat to inmate a year before he was assaulted);  *Mosher v. Nelson,* 589 F. 3d 488, 495, f.n. 5 (1st Cir. 2009) (specific information and warnings about inmates are components of overall circumstances that contribute to determination of deliberate indifference.

Anctil's statements to Dwight Fowles demonstrate that there was no reason to believe that Anctil would be in danger if he were returned to C-pod: the person or persons who had

attacked him there months before were no longer there; he did not have any problems during the week after he moved in until he was assaulted; he had a disagreement with his cell mate which was, by his own account, resolved; Anctil did not report any problems to staff before the assault; and the attack by his cell mate came as a complete surprise.  On these facts, prison officials were not deliberately indifferent to a known, significant risk that Anctil would be assaulted.

In addition, after the padlock assault on September 29, Unit Manager Mendez took the reasonable precaution of placing a Level II "keep separate" order on Anctil and his assailant, meaning that they would be kept in separate housing units, thus minimizing the possibility of contact between the two.  The fact that this measure did not prevent Anctil from getting into a fight with his former cellmate while they were outside of their housing units as part of general prisoner movement does not make out liability of prison officials for violating Anctil's Eighth Amendment rights.

The case against Ross is, of course, even more tenuous. Absent an underlying constitutional violation by his subordinates, Ross cannot be held liable under Anctil's only surviving theory of a failure to train.  Ross' affidavit clearly establishes that he was not involved in decisions as to where Anctil should be housed, nor was he responsible for training the staff who made those decisions.  Moreover, he was completely justified in relying on the decisions of the unit manager and shift commander, each of whom had decades of experience working in security aspects of the prison.

**Conclusion**

For the reasons stated above, defendants request that the court enter judgment in their favor.

May 8, 2018                                   ___/s/  James E. Fortin___
                                              James E. Fortin
                                              Assistant Attorney General

Office of the Attorney General
Six State House Station
Augusta, ME 04333
626-8800

Certificate of Service

The undersigned hereby certifies that he electronically filed the above document with the Clerk of Court using the CM/ECF system, which will serve a copy on all counsel of record, and that he mailed a copy, postage paid, to the following:

Steve Anctil, Jr.
Maine State Prison
807 Cushing Road
Warren, ME 04864

May 8, 2018                                   /s/ James E. Fortin
                                              James E. Fortin
                                              Assistant Attorney General