STEVE ANCTIL, JR.,       )
                                   )
             Plaintiff        )
                                   )
          v.                )      1:16-cv-00107-JAW
                                   )
JOSEPH FITZPATRICK, et al.,   )
                                   )
             Defendants   )

## RECOMMENDED DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In this action, Plaintiff alleges Defendant Troy Ross, the Deputy Warden at the Maine State Prison, failed to protect him from harm caused by other inmates, and that Defendant Joseph Fitzpatrick, the Commissioner of the Department of Corrections, and Defendants Rodney Bouffard and Randall Liberty, the former and current Wardens of the Maine State Prison, deprived him of his right to his legal mail. (Order Affirming Recommended Decision and Addressing Other Pending Motions, ECF No. 90.)

The matter is before the Court on Defendants' Motion for Summary Judgment. (ECF No. 93.) Following a review of the summary judgment record, and after consideration of the relevant legal issues, I recommend the Court grant Defendants' motion for summary judgment.

### PROCEDURAL BACKGROUND

After Plaintiff filed this action on February 24, 2016, he amended the complaint on two occasions. (Complaint, ECF No. 1; Amended Complaint, ECF No. 18/24; Amended

Complaint, ECF No. 31.)  In his original complaint, Plaintiff asserted a claim based on a challenge to the grievance policy and grievance practices at the Maine State Prison.  As explained in a recommended decision after a review of Plaintiff's complaint, Plaintiff did not allege an actionable claim.  (Recommended Decision, ECF No. 9.)

On April 6, 2016, Plaintiff moved to amend the complaint (Motion, ECF No. 16), and subsequently filed a proposed amended complaint.  (Amended Complaint, ECF No. 18.)  In his proposed amended complaint, Plaintiff named as defendants Joseph Fitzpatrick, Rodney Bouffard, Randall Liberty, Troy Ross, and Wendell Atkinson.  The Court granted the motion to amend.  (ECF No. 23.)

Following a review of the amended complaint, I recommended the Court dismiss the claims asserted in the amended complaint, but that Plaintiff be afforded another opportunity to amend the complaint.  (Recommended Decision, ECF No. 25.)  On July 7, 2016, Plaintiff filed a second amended complaint, which pleading he dated and signed "under penalty of perjury."  (Second Amended Complaint, ECF No. 31.)  In the second amended complaint, Plaintiff alleged facts related to each of the matters he had grieved. (ECF No. 31-1.) [1]

On October 24, 2016, following a review of the second amended complaint, I determined the second amended complaint generated the following legal issues and claims: First Amendment (access to court, legal mail, retaliation, and access to newspapers), Fourth Amendment (monitored legal telephone calls), Eighth Amendment (failure to protect,

---

[1] In addition to signing his pleadings under penalty of perjury, on October 27, 2016, Plaintiff filed an affidavit in which Plaintiff stated that the pleadings he filed with the Court were "true and correct, in whole, based on actual knowledge."  (ECF No. 37.)

failure to treat, unsanitary conditions, and noise), Fourteenth Amendment (failure to compensate for damaged or lost property and improper charges to prison account), and Challenge to Grievance Procedures (claims asserted against Defendant Atkinson, in his role as Grievance Review Officer). (Recommended Decision, ECF No. 36.) I recommended the Court dismiss all Plaintiff's claims except for his claim regarding the failure to protect against an assault and the related failure to train, which claim would proceed as a deliberate indifference claim against Defendant Ross. (*Id.* at 3 – 19.) As explained in the recommended decision, the claim concerns assaults that occurred between September and November, 2014:

> Plaintiff alleges that in September 2014 he was relocated to "Charlie Pod" after notifying the pod officer that he believed he would not be safe in that pod. According to Plaintiff, the officer told him he would be moved after the officer placed "a phone call." (Second Am. Compl., Statement of Claim, at 1, ECF No. 31-1.) A week later, Plaintiff was assaulted by an inmate in Charlie Pod with "two combination locks on a belt, and stabbed in the chest." (*Id.*) Several days later, Plaintiff addressed his concerns "with staff." (*Id.* at 2.) In October 2014, Defendant Atkinson "declined to investigate" and stated that Plaintiff should have presented the issue sooner. (*Id.*) In November 2014, Plaintiff was again assaulted by the same inmate. (*Id.*) In May 2015, Plaintiff informed Defendant Fitzpatrick that he was advised he would be stabbed again and in June 2015, Defendant Ross responded that Plaintiff's concerns "don't require further review, as [he] created [his] own issues." (*Id.*)

(Recommended Decision at 36.)

On January 20, 2017, Plaintiff filed a supplement to his pleadings, seeking leave to amend. The supplement consisted of 92 paragraphs related to events that occurred between April, 2016, and January, 2017, mostly related to mail. (Supplemental Pleading, ECF No. 46.) After a review of the supplemental pleadings, I recommended the Court permit

Plaintiff to proceed solely on his failure to protect claim against Defendant Ross. (Recommended Decision, ECF No. 53.)

The Court affirmed in part the recommended decision. The Court agreed that Plaintiff stated an actionable claim against Defendant Ross regarding an assault by another prisoner. The Court also determined that Plaintiff stated a claim "of inadequate access to the courts [based on] Defendants' alleged failure to properly handle the Plaintiff's incoming and outgoing legal mail pertaining to Plaintiff's efforts to challenge the conditions of his confinement." (Order, ECF No. 68.) The Court therefore permitted Plaintiff to supplement his mail claim through the supplemental pleading. (Order at 6, 13 – 14.)

On October 5, 2017, Defendant Ross moved to dismiss Plaintiff's claim. Defendant Ross argued the allegations do not permit a plausible inference that he was aware of or involved in matters related to Plaintiff's failure to protect claim, or that he had cause to believe there was a need for additional training. (ECF No. 70.) After Plaintiff filed a response to the motion, I recommended the Court deny the motion. (ECF No. 80.) The Court subsequently affirmed the recommended decision and denied Defendant Ross's motion to dismiss. (ECF No. 90.)

On May 8, 2018, Defendants filed the pending motion for summary judgment and a supporting statement of material facts. (ECF Nos. 93, 94.) On May 29, 2018, Plaintiff asked the Court to stay the proceedings or to extend the time to for him to respond to

Defendants' motion for summary judgment.[2] (ECF No. 98.) The Court denied the request for a stay, but extended the time for Plaintiff to file a response to the motion. (ECF No. 108.)

Noting the deadline for Plaintiff's response had expired without the filing of a response, by order dated November 13, 2018, the Court advised Plaintiff that the Court intended to begin its review of and decide the motion. The Court also informed Plaintiff that if Plaintiff wanted to object to the motion, Plaintiff should file his response promptly. (Order, ECF No. 122.) The Court subsequently reiterated the Court's intention to review and decide the motion. (Order, ECF No. 125.) Plaintiff has not filed a response to the motion for summary judgment.

## SUMMARY JUDGMENT RECORD

When presented with a summary judgment motion, a court ordinarily considers only the facts included in the parties' statements of material facts, which statements must be supported by citations to evidence of record. Federal Rule of Civil Procedure 56(c) and District of Maine Local Rule 56(b) – (d) require the specific citation to record evidence. In addition, Local Rule 56 establishes the manner by which parties must present their factual statements and the evidence on which the statements depend. A party's pro se status

---

[2] Plaintiff asserted that he had no meaningful access to legal material. (ECF No. 98.) Plaintiff's motion and Defendants' response revealed there had been a malfunction with a computer terminal used to access the Lexis online research service, and that the computer was the only computer available to prisoners in Plaintiff's housing unit to access the service. (*Id.*; Opposition to Motion to Stay, ECF No. 102.) The record, however, also established that Plaintiff regularly obtained legal resources through requests submitted to the prison's librarian. Additionally, Plaintiff could obtain greater access to legal materials by pursuing a change in his privilege level, qualified for the change, but declined to make the request. (ECF No. 102.)

does not relieve the party of the obligation to comply with the court's procedural rules.[3] *Ruiz Rivera v. Riley*, 209 F.3d 24, 27 – 28 & n. 2 (1st Cir. 2000); *Marcello v. Maine*, 489 F. Supp. 2d 70, 77 (D. Me. 2007).

By rule, a party seeking summary judgment must file, in addition to its summary judgment motion, a supporting statement of material facts setting forth each fact in a separately numbered paragraph, with each factual statement followed by a citation to evidence of record that supports the factual statement. D. Me. Loc. R. 56(b). A party opposing a motion for summary judgment must file an opposing statement in which it admits, denies, or qualifies the moving party's statements by reference to each numbered paragraph, with citations to supporting evidence, and in which it may set forth additional facts, in separately numbered paragraphs, with citation to supporting evidence. D. Me. Loc. R. 56(c). If an additional statement is introduced by the non-moving party, the moving party must file a reply statement in which it admits, denies, or qualifies the non-moving party's additional statements by reference to each numbered paragraph, with citations to supporting evidence. D. Me. Loc. R. 56(d).

"Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." D. Me. Loc. R. 56(f). Additionally, "[t]he court may disregard

---

[3] "[T]he Court is required to maintain a strict neutrality between opposing parties and even though a more forgiving reading may be appropriate for a pro se party in the summary judgment context, it is also true that '[j]udges and magistrate judges who review these filings must be able to rely on procedural rules so as to avoid becoming the lawyer for the unrepresented [party] or devoting an excessive portion of their time to such cases.'" *United States v. Baxter*, 841 F. Supp. 2d 378, 383 (D. Me. 2012) (quoting *Clarke v. Blais*, 473 F. Supp. 2d 124, 129 (D. Me. 2007)).

any statement of fact not supported by a specific citation to record material properly considered on summary judgment." *Id.* Finally, "[t]he court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts." *Id.*

Nevertheless, the factual assertions contained in the verified pleadings and affidavits filed by a pro se litigant generally will be considered in the review of a summary judgment motion. That is, where a pro se litigant has failed to comply strictly with the summary judgment rules, this Court has considered the sworn assertions of record. *See Clarke v. Blais*, 473 F. Supp. 2d 124, 128 – 30 (D. Me. 2007) ("The First Circuit has not addressed this notice debate directly, but has said, in the summary judgment context, that unrepresented plaintiffs' opposing affidavits and opposition papers are to be read 'liberally.'" (citing *Posadas de Puerto Rico*, *Inc. v. Radin*, 856 F.2d 399, 401 (1st Cir. 1988), and *Mas Marques v. Digital Equip. Corp.*, 637 F.2d 24, 27 (1st Cir. 1980)); *Demmons v. Tritch*, 484 F. Supp. 2d 177, 182 – 83 (D. Me. 2007).

## BACKGROUND FACTS [4]

### A.    Failure to Protect

On March 29, 2014, when Plaintiff was assigned to C-pod of the Close Unit at the Maine State Prison, Sgt. Kevin Cox observed that Plaintiff had a black eye. Plaintiff told Sgt. Cox the injury occurred accidentally during a basketball game. Plaintiff assured Sgt.

---

[4] The following facts are drawn from Defendants' statement of material facts. (DSMF, ECF No. 94.) Plaintiff did not file a response to the factual assertions contained in Defendants' statement. Accordingly, given the failure to respond, Plaintiff's ability to contest any of Defendants' factual assertions is limited to statements contained in his complaint, amended complaint, and supplement to his amended complaint, which pleadings Plaintiff signed under penalty of perjury.

Cox that there were no safety issues for him in the pod and that he got along with all the prisoners in the pod.  (DSMF ¶ 16.)

At the request of the medical department, Plaintiff was isolated until x-rays could be taken and it could be determined whether he had sustained an orbital fracture and whether he was safe in population.  Plaintiff was placed on Emergency Observation Status in a cell in A-pod the same day.  (*Id.* ¶ 17.)  Plaintiff remained in A-pod until September 11, 2014, when he was transferred back to C-pod.  (*Id.* ¶ 18.)  Plaintiff asserts that he informed a pod officer that he believed he would not be safe in C-pod, but the officer placed him in C-pod after placing a phone call.  (Second Am. Compl., Statement of Claim, at 1, ECF No. 31-1.)  Plaintiff has not identified or described a specific threat.

On September 18, 2014, Plaintiff's cellmate assaulted him without warning in the C-pod dayroom.  A subsequent investigation revealed that the two prisoners were involved in an altercation in their cell the previous evening, as evidenced by a minor stab wound to Plaintiff's shoulder and what appeared to be a razor slash across the left side of the cellmate's face.  (*Id.* ¶ 19.)

Following a complaint from Plaintiff's mother, Dwight Fowles, the Intelligence/Fugitive Coordinator at the prison, was assigned to investigate the September 18, 2014 incident.  (*Id.* ¶ 22.)  When Mr. Fowles interviewed Plaintiff, Plaintiff complained of the conduct of one of the officers who was present and responded to the incident.  He also complained about Unit Manager Antonio Mendez's decision to place Plaintiff in Close C-pod after Plaintiff had informed staff that he had previously been assaulted in Close C-pod.  (*Id.* ¶ 23.)

When Mr. Fowles asked Plaintiff if he had spoken directly to Unit Manager Antonio Mendez about his concern, Plaintiff reported he had only spoken with the pod officer. Plaintiff was unable to identify the officer with whom he spoke. Plaintiff also reported that the prisoner who had assaulted him previously was not in C-pod. Mr. Fowles also asked Plaintiff if he provided staff with the names of the prisoners with whom he believed would present a problem, he advised there were no such specific prisoners in the pod. (*Id.* ¶ 24.) Plaintiff also stated he had not had any problems after moving to the pod after the prior assault. He told Mr. Fowles that his cellmate initially did not want to live with him because the cellmate heard that Plaintiff had informed on some other prisoners. Plaintiff advised that he and his cellmate had worked things out, and that he did not report any problems to staff prior to the assault. (*Id.* ¶ 25.) Mr. Fowles asked Plaintiff if he had any idea he was going to be assaulted by his cellmate; Plaintiff reported the assault was a complete surprise. (*Id.* ¶ 26.)

After the September incident, Plaintiff spent some time in the infirmary before being transferred to Close F-pod. Close Unit Manager Mendez entered a Level II "keep separate" notification on Plaintiff and the former cellmate in the prisoner database, which notification required that they be assigned to different pods. The former cellmate remained in Close C-pod. Prisoners in different pods within the Close Unit occasionally might interact with each other, particularly when prisoners are moved for meals, jobs and activities. (DSMF ¶ 20.) On November 4, 2014, Plaintiff and his former cellmate were involved in a fight in the hallway between Close C-pod and F-pod, but the report of this incident does not suggest that Plaintiff sustained an injury. (*Id.* ¶ 21.)

In May 2015, Plaintiff reported that he was advised he would be stabbed again. According to Plaintiff, in June 2015, Defendant Ross responded that Plaintiff's concerns "don't require further review, as [he] created [his] own issues." (Second Am. Compl., Statement of Claim, at 2.)

In his capacity as Deputy Warden, Defendant Ross is not responsible for training security staff at the prison. Officers receive their initial training during a six-week course administered by the Maine Criminal Justice Academy, and additional training is provided informally on the job and formally by the Department's training staff. (*Id.* ¶ 27.) Defendant Ross was not involved in the decisions regarding Plaintiff's housing placements in 2014. Decisions about where to place prisoners within the Close Unit were made by the unit management team as led by the Unit Manager and the Shift Commander. At that time, Antonio Mendez was the Close Unit Manager and Capt. Kenneth Vigue was the Shift Commander.

## B. Legal mail claim

### 1. Outgoing mail

The Maine Department of Corrections maintains a policy for incoming and outgoing prisoner mail, Policy 20.1, Prisoner Mail. (*Id.* ¶ 1.) Prisoners in general population place outgoing mail in locked mail boxes located on the path to the dining facility. (*Id.* ¶ 2.) Prisoners in restricted housing (which includes housing in the Special Management Unit, Infirmary, Administrative Control Unit, and Structured Living Unit) deposit their outgoing mail in locked mail boxes in their unit. (*Id.* ¶ 3.) Mail room staff collect the boxes, usually by 10 a.m., bring them to the mail room, and process the mail. (*Id.*)

Prisoners who do not have postage stamps or who must send an item by certified mail do not deposit their mail in the locked mail boxes. Because they must request the transfer of funds from their prison trust accounts to pay for postage, prisoners are required to attach a transfer request slip to the mail and give the slip and mail to a designated officer in their housing unit. The designated officer delivers the mail to the mail room, where mail room staff weigh the mail to determine the amount of postage required and send the transfer slips to the business office. Staff in the business office then debit the prisoner's account and return the transfer slip to the mail room. Mail room staff then affix the appropriate amount of postage. (*Id.* ¶ 4.) If a prisoner has no funds in his account, the business office will note this on the transfer slip, return the outgoing mail to the mail room, and the mail room will return it to the prisoner. (*Id.* ¶ 5.)

Prisoners are provided free postage for two one-ounce letters per week. In addition, the Department will pay for outgoing "legal mail," if the prisoner has no funds to pay for postage. The processing of requests for free legal mail postage is the same as the transfer slip process. The business office determines whether the outgoing mail constitutes "legal mail" for which free postage is available. (*Id.* ¶ 6.)

Other than on Saturdays, Sundays, and holidays, outgoing mail is ordinarily collected, processed, and delivered to the post office on the day it is deposited. Delays occasionally occur, such as when mail room staff are diverted to assist in a security incident, the facility is locked down, or the volume of mail is particularly high. In such instances, the mail is delivered to the post office the following weekday. (*Id.* ¶ 7.)

## 2. *Incoming mail*

Mail room staff process all incoming prisoner mail. (*Id.* ¶ 8.) Staff initially inspect the envelope for a legible return address. If the staff member inspecting the mail concludes the mail is not legal mail, he or she places the mail in a collection that will be opened and inspected for checks, money orders or contraband.[5] (*Id.* ¶¶ 8, 11.) If the staff member concludes the mail is legal mail, the mail is not to be opened in the mail room. (*Id.* ¶ 9.) Mail from an attorney, a court, an advocacy group like the ACLU, or an elected official is considered legal mail. If the return address is that of a state agency, unless the name of a particular individual appears in the return address, the mail is not considered legal mail. (*Id.*)

If the mail is determined to be legal mail, the mail is delivered to the prisoner's housing unit, where the shift supervisor or another designated officer will call the prisoner to his or her office, and then open and inspect the mail in the prisoner's presence. The prisoner is then required to sign a log or receipt to reflect that the mail was opened in the prisoner's presence. (*Id.*)

Non-legal mail is opened in the mail room using a machine that moves the envelopes along a conveyor and opens the envelopes. On occasion, a piece of legal mail will inadvertently be opened in the mail room. This can occur when two pieces of mail stick together and are run through the opening machine, when it cannot be determined from the return address on the envelope that it is legal mail, or from simple inadvertence when a

---

[5] Although the mail room staff opens and inspects incoming mail, they are not permitted to read the mail. Any surveillance of incoming mail for security purposes is done by others with the approval of the Warden or designee, and mail may be diverted for that reason. (DSMF ¶ 10.)

large volume of mail is processed.  (*Id.* ¶ 11.)  When legal mail is accidentally opened in the mail room, a note is made on the envelope advising the prisoner of that fact.  The mail room staff do not read the mail.  (*Id.* ¶ 12.)

Eric Wildes, the mail room supervisor at the Maine State Prison, is familiar with Plaintiff and has responded to some of his complaints about his legal mail.  Mr. Wildes reports the following:

> On April 24, 2015, Plaintiff complained about receiving a package from the Maine Human Rights Commission that was taped closed. There was no indication that the package had not been received in that condition or that the mail room had opened it and then taped it closed again.
>
> On October 19, 2015, Plaintiff complained that a letter from the Maine Volunteer Lawyers' Project was opened outside of his presence.  Inspection of the envelope showed that the return address (specifically the words "Lawyers' Project") was partially obscured by a white bar code label that had been affixed to the envelope, so that the mail was not identifiable as legal mail.
>
> On November 24, 2015, a letter from the state Office of Program Evaluation and Government Accountability was opened outside Plaintiff's presence.  The mail room staff did not consider this legal mail, and it was later determined that mail from OPEGA would not be considered privileged unless the return address included the name of the director or one of the OPEGA committee members.
>
> On December 14, 2015, Plaintiff claimed that unit staff removed a piece of his outgoing legal mail from the SMU mailbox.  (There was no indication that the mail was opened or read or not brought to the mail room to be sent out.)  Plaintiff was advised that the SMU mailbox is locked and only mail room staff have the key.
>
> At one point, the mail room received a complaint from the local post office that a couple of its employees had sustained injuries as the result of staples being left in outgoing prisoner mail.  This was the result of prisoners or staff stapling transfer slips to the envelopes rather than using tape or paper clips.  Staff and prisoners were advised not to use staples on outgoing mail, or the mail would be returned.  Despite this, Plaintiff persisted in using staples, and several pieces of outgoing mail were returned to him for this reason.

On April 3, 2016, a letter from Plaintiff to the United States District Court was returned as undeliverable. Mail room staff mistakenly opened the returned letter outside of Plaintiff's presence (but did not read the letter.) This was inadvertent.

(*Id.* ¶ 13.)

Between the end of July 2016 and the end of December 2016, the business office approved payment of postage for eighty-four items of outgoing legal mail from Plaintiff. (*Id.* ¶ 14.) The business office does not keep a copy of a transfer slip if it is determined that the envelope does not contain legal mail and does not qualify for free postage. In such a case, the mail is simply returned to the prisoner. The business office, therefore, does not have a record of when it refused a request by Plaintiff to pay for postage. Plaintiff filed five grievances with the business office regarding the refusal to pay for postage for his outgoing mail. (*Id.* ¶ 15.)

According to the database of the Litigation Division of the Office of the Attorney General, in addition to this case, Plaintiff is currently or has recently been the plaintiff, petitioner, or complainant in the following actions brought against the Maine Department of Corrections, its employees, or other state agencies:

*Steve Anctil v. Jodie Breton*, *Public Access Officer*, PORSC-CV-16-184 and AUGSC-CV-16-1178, Law Court Docket No. Ken-17-418

*Steve Anctil v. Public Access Officer*, PORSC-CV-16-122 and AUGSC-CV-16-143, Law Court Docket No. Ken-17-123

*Steve Anctil v. Joseph Fitzpatrick*, *Public Access Officer*, Kennebec Superior Court, AP-17-113

*Steve Anctil v. Maine Dep't of Corr.*, Maine Human Rights Commission, PA-17-03423-A

*Steve Anctil v. Maine State Prison*, Rockland District Court, PA-217-53, Law Court Docket No. Kno-17-338

*Steve Anctil v. Admin. Office of the Courts*, Kennebec Superior Court, CV-16-166

*Steve Anctil v. Maine State Prison*, Rockland District Court, SA-16-235, Law Court Docket No. Kno-17-153

*Steve Anctil v. Maine Dep't of Corr.*, Knox Superior Court, AP-17-33

*Steve Anctil v. Joseph Fitzpatrick, et als.*, Knox Superior Court, AP-18-004

## DISCUSSION

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Perry v. Roy*, 782 F.3d 73, 77 (1st Cir. 2015). If a court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of his claims, a trial-worthy controversy exists and summary judgment must be denied as to any supported claim. *Id.* ("The district court's role is limited to assessing whether there exists evidence such that a reasonable jury could return a verdict for the

nonmoving party." (internal quotation marks omitted)). Unsupported claims are properly dismissed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

### A. Failure to Protect

Defendant Ross contends the record cannot support a finding that a corrections officer was deliberately indifferent toward a known, serious risk to Plaintiff's safety, or that Defendant Ross had notice of any danger to Plaintiff or was otherwise involved in decisions related to Plaintiff's housing assignments. (Motion at 14 – 15.)

The Cruel and Unusual Punishment Clause of the Eighth Amendment, as applied to the states through the Fourteenth Amendment, imposes a duty on prison officials to protect inmates from violence from other inmates. *Lakin v. Barnhart*, 758 F.3d 66, 70 (1st Cir. 2014). "That duty has its origins in the forced dependency of inmates[.]" *Giroux v. Somerset Cty.*, 178 F.3d 28, 31 (1st Cir. 1999). "Having incarcerated 'persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct,' having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer v. Brennan*, 511 U.S. 825, 833 (1970) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526 (1984)).

Under the law, however, not every incident of prisoner-on-prisoner violence that results in injury gives rise to constitutional liability. *Lakin*, 758 F.3d at 70. To raise a genuine issue of constitutional liability, a plaintiff must demonstrate that he or she was "incarcerated under conditions posing a substantial risk of serious harm," and that the defendant "acted, or failed to act, with 'deliberate indifference to inmate health or safety.'"

*Id.* (quoting *Farmer*, 511 U.S. at 834). In other words, a plaintiff must satisfy both an objective standard (substantial risk of serious harm) and a subjective standard (deliberate indifference) in order to prove a claim of deliberate indifference. *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014) (en banc). "[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.

Plaintiff claims Defendant Ross acted with deliberate indifference regarding the assaults that occurred in September and November, 2014. Contrary to Plaintiff's argument, the record establishes that the September assault was unanticipated even by Plaintiff, who did not identify a specific threat in advance of the assault. Moreover, the record demonstrates that the assault involved an assailant (Plaintiff's cellmate) who had not previously demonstrated any aggression toward Plaintiff, and with whom Plaintiff had not reported issues. Given the record, the finder of fact could not conclude that an officer responsible for Plaintiff's housing had prior notice of a serious threat to Plaintiff's safety.

After the September incident, Plaintiff and his former cellmate were assigned to different pods. Although they had a brief encounter that involved an altercation in November 2014, the record lacks any evidence of deliberate indifference by Defendant Ross or any other officer at the Maine State Prison.[6] The mere fact that a subsequent altercation occurred is insufficient to establish deliberate indifference.

_____

[6] The Seventh Circuit has observed, in the context of a failure to protect claim, that "it is the reasonably preventable assault itself, rather than any fear of assault, that gives rise to a compensable claim under the Eighth Amendment." *Jones v. Butler*, 663 F. App'x 468, 470 (7th Cir. 2016) (quoting *Babcock v. White*,

**B. Mail**

While "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system," *Price v. Johnston*, 334 U.S. 266, 285 (1948), the First Amendment protects a prisoner's ability to correspond on a broad range of topics, including the vindication of a prisoner's rights, and it protects legal mail from unlawful interception and censorship.

Defendants Fitzpatrick, Bouffard, and Liberty argue Plaintiff's mail claim does not constitute a deprivation of a constitutional right, and that the record does not disclose, in any event, that they had any involvement in matters related to Plaintiff's legal mail, other than their review of grievances. (Motion at 10 – 13.)

**1. Outgoing mail**

The First Circuit's assessment of claims arising out of the right to send mail has been governed by the Supreme Court's decision in *Procunier v. Martinez*, 416 U.S. 396, 412–13 (1974), overruled on other grounds by *Thornburgh v. Abbott*, 490 U.S. 401 (1989). *See Stow v. Grimaldi*, 993 F.2d 1002 (1st Cir. 1993) (considering a policy calling for inspection/censorship of outgoing mail, but not involving outgoing legal mail). In *Martinez*, the Supreme Court held that outgoing prisoner mail may be censored if it furthers "an important or substantial governmental interest unrelated to the suppression of expression" and the burden imposed is "no greater than is necessary or essential to the

---

102 F.3d 267, 272 (7th Cir. 1996)). In appropriate circumstances, injunctive relief is available and a prisoner need not "await a tragic event." *Farmer*, 511 U.S. at 846 (quoting *Helling v. McKinney*, 509 U.S. 25, 33 (1993)). Plaintiff's pleadings do not disclose an existing danger to his person.

protection of the particular governmental interest involved." 416 U.S. at 412 – 13. In *Thornburgh*, the Court held that censorship of incoming mail is subject to a lower, reasonableness standard. 490 U.S. at 413. Both cases addressed prison regulations that censored, i.e., prohibited, certain communications based on content.[7] *Thornburgh*, 490 U.S. 404–405 (censorship of incoming mail deemed "detrimental to the security, good order, or discipline of the institution"); *Martinez*, 416 U.S. at 399 (censorship of outgoing letters that "unduly complain," "magnify grievances," or "express inflammatory political, racial, religious or other views or beliefs"). The Court explained in *Thornburgh* that the higher standard for censorship of outgoing mail was the product the Court's "recognition that the regulated activity centrally at issue in that case—outgoing personal correspondence from prisoners—did not, by its very nature, pose a serious threat to prison order and security." *Thornburgh*, 490 U.S. at 411. In other words, *Martinez* reflects that prison administrators generally do not have an institutional interest in the consequence of outgoing speech activity, and, therefore, censorship of outgoing communications is less likely to be sustained. *Id.* at 409–10. Where an interest in internal prison administration is evident, prison regulation that burdens a constitutional right need only be "generally necessary" to a legitimate penological interest. *Id.* at 409–412 (reconciling *Martinez* with *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

According to Plaintiff, the following outgoing mail was not mailed by prison staff:

Nov. 4, 2015, letter to this Court not mailed (ECF No. 31-1 at 5);

---

[7] In *Stow*, the First Circuit "assume[d] without deciding that the inspection of plaintiff's mail constitutes censorship." 993 F.2d at 1003 n.2. In *Wolff*, the Supreme Court observed that that "freedom from censorship is not equivalent to freedom from inspection or perusal." 418 U.S. at 576.

Apr. 25, 2016, letter to Cumberland County Superior Court not mailed (ECF No. 46, ¶ 2);

May and June, 2016, letter to Attorney General's Office and letter to this Court misplaced by Officer Fillebrown for months (*Id.* ¶ 3);

May 17, 2016, refusal to send mail to this Court (*Id.* ¶ 4);

May 30, 2016, refusal to send mail to Law and Legislative Reference Library[8] (*Id.* ¶ 9);

June 7, 2016, refusal to send mail to Kennebec County Sheriff (*Id.* ¶ 10);

June 12, 2016, refusal to send mail to this Court (*Id.* ¶ 11);

June 14, 2016, refusal to send mail to Center for Public Integrity (*Id.* ¶ 12);

June 20, 2016, refusal to send mail to Rockland District Court and Cumberland County Superior Court (*Id.* ¶ 15);

June 22, 2016, return of legal mail by USPS as undeliverable due to improper address (*Id.* ¶ 16);

June 28, 2016, refusal to send mail to Maine State Controller and Chairman of the Commission on Uniform State Laws (*Id.* ¶ 19);

June 30, 2016, refusal to send mail to Cumberland County Superior Court and Assistant Attorney General Morrell (*Id.* ¶ 21);

June 30, 2016 refusal to send mail to Maine Administrative Office of the Courts (*Id.* ¶ 23);

July 11, 2016, refusal to send mail to the director of the Office of Program Evaluation and Government Accountability (OPEGA)[9] (*Id.* ¶ 24);

July 22, 2016, refusal to send mail to the Maine State Auditor (*Id.* ¶ 27);

---

[8] Plaintiff evidently was able to send mail to the library because he received return mail from the library. (ECF No. 46 ¶ 83.)

[9] Plaintiff evidently was able to send mail to OPEGA, as he has been the recipient of mail from OPEGA. (DSMF ¶ 13.)

July 31, 2016, refusal to send mail to Maine Human Rights Commission and Department of Corrections Commissioner Fitzpatrick (*Id.* ¶ 28);

July 28, 2016, refusal to send mail to Kennebec County Superior Court and Maine Human Rights Commission (*Id.* ¶ 29);

July 28, 2016, refusal to send mail to Maine Public Access Officer Jody Breton (*Id.* ¶ 30);

August 1, 2016, refusal to send mail to Cumberland County Superior Court (*Id.* ¶ 31);

August 1, 2016, refusal to send mail to Maine State Court Administrator and Maine State Treasurer's Office (*Id.* ¶ 32);

August 4, 2016, refusal to send mail to Maine State Controller and Maine State Court Administrator (*Id.* ¶ 35);

August 5, 2016, refusal to send mail to Rockland Police Department[10] (*Id.* ¶ 36);

August 16, 2016, refusal to send mail to Kennebec County Sheriff – Civil Service Department (*Id.* ¶ 40);

August 22, 2016, refusal to send mail to this Court and Kennebec County Superior Court (*Id.* ¶ 41);

August 24, 2016, refusal to send mail to Commissioner of the Department of Environmental Protection (*Id.* ¶ 44); [11]

September 27, 2016, advised that Maine Human Rights Commission never received mail sent on August 29, 2016 (*Id.* ¶ 54);

September 29, 2016, refusal to send mail to the Office of the Governor (*Id.* ¶ 55);

October 27, 2016, Plaintiff was advised that this Court did not receive a letter sent September 15, 2016 (*Id.* ¶ 73);

---

[10] Plaintiff evidently was able to send mail to the Rockland Police Department because he received return mail in December, 2016.  (ECF No. 46 ¶ 87.)

[11] Plaintiff evidently was able to correspond with the DEP because he received mail from DEP in December, 2016.  (ECF No. 46 ¶ 83.)

November 15, 2016, refusal to send mail to Office of the Commissioner for the Department of Administrative and Financial Services (*Id.* ¶ 75);

November 30, 2016, refusal to send mail to the Chief of the Thomaston Police Department (*Id.* ¶ 79);

December 7, 2016, refusal to send mail to Maine Human Rights Commission (*Id.* ¶ 84);

December 27, 2016, refusal to send mail to the Office of the Governor (*Id.* ¶ 91);

and

December 29, 2016, refusal to send mail to the Executive Director of the Legislative Counsel, Grant T. Pennoyer (*Id.* ¶ 92).

Plaintiff has thus identified approximately 30 instances over 13 months (i.e., November 2015 through December 2016) when requests to send mail were denied, even though Plaintiff considered the mail to be legal mail concerning a condition of confinement.

Plaintiff has a right to send mail, whether or not the mail is addressed to a legal or a non-legal recipient, and even if the mail is critical of prison administration. *Thornburgh v. Abbott*, 490 U.S. 401, 411 – 12 (1989). Plaintiff also has a right to receive some postage subsidy to ensure that he has meaningful access to the courts to pursue post-conviction remedies or to seek redress for non-frivolous grievances arising from the conditions of his confinement. *Bounds v. Smith*, 430 U.S. 817, 824 – 25 (1977). Plaintiff, however, does not have a right to an unlimited postage subsidy for any and all mail he wishes to send, even if the mail concerns the conditions of his confinement. [12]

_____

[12] *See*, *e.g.*, *Smith-El v. Steward*, 33 Fed. App'x 714 (6th Cir. 2002) (affirming summary judgment for defendants, based on qualified immunity, where state policy provided that prisoners who exhausted free

Despite Plaintiff's ability to itemize several instances in which a request to send mail was denied or mail believed to have been posted failed to reach its intended recipient, the record establishes that Plaintiff is relying on the State of Maine to pay his postage and that, in the six-month period between July 2016 and December, 2016, the Maine State Prison business office approved payment of postage for eighty-four items of outgoing legal mail sent by Plaintiff. (*Id.* ¶ 14.) The uncontroverted record thus establishes that the mail administrators at the Maine State Prison have permitted and arranged payment for Plaintiff to send a significant amount of outgoing legal mail.

Additionally, the record evidence does not reflect any act of censorship. That is, although a prisoner's "right to access the courts very often implicates the related right to communicate via mail on these topics," *Anctil v. Fitpatrick*, No. 1:16-cv-107-JAW, 2017 WL 4284068, at *3 (D. Me. Sept. 27, 2017) (citing *Nolan v. Scafati*, 430 F.2d 548, 550 – 51 (1st Cir. 1970)), there is no evidence in this case that Defendants prevented Plaintiff from communicating with outside agencies and others concerning his grievances related to prison conditions. On this record, the finder of fact could not determine that Defendants censored Plaintiff's outgoing mail. [13]

---

postage allotment could apply for a postage loan, but conditioned the grant of a postage loan on review of the mail to determine whether it was in fact legal in nature, including whether a deadline was pending).

[13] In *Nolan*, the First Circuit vacated the dismissal of a prisoner's suit where the prisoner alleged that he was prevented from communicating with "bona fide attorneys working in an organization such as the Civil Liberties Union." 430 F.2d at 551. The record in this case does not include evidence of actions taken with the intent to prevent Plaintiff from communicating with outside agencies or organizations that might assist him with his efforts to challenge conditions of his confinement.

The record also would not support a finding that the business office's administration of the postage subsidy did not advance "important or substantial governmental interest[s] unrelated to the suppression of expression." *Procunier v. Martinez*, 416 U.S. 396, 413-14 (1974), *overruled on other grounds by Thornburg*, 490 U.S. at 413 – 14 (limiting the analysis articulated in *Procunier* to regulation of outgoing prisoner mail only). A prison must be able to limit reasonably the extent of the postage subsidy for legal mail necessary for a prisoner to the exercise her or his *Bounds* rights. For instance, a prisoner should not be permitted to exceed reasonable restrictions placed on the subsidy by writing letters to multiple governmental agencies regardless of whether the agencies have the authority to address the prisoner's complaint. The postage subsidy is required only when it is necessary to preserve a prisoner's right to meaningful access to the courts. Here, Plaintiff has not provided any evidence to support a finding that the unsent mail concerned a non-frivolous request for legal assistance related to the conditions of his confinement, and that his communication with the intended recipient was necessary to his ability to access the courts.

Finally, to the extent Plaintiff maintains that some mail he sent did not reach this Court or another court, Plaintiff has not demonstrated that he suffered actual harm in the context of any litigation. In fact, the record reflects that Plaintiff has prosecuted or is prosecuting several cases. Plaintiff thus has had regular access to the courts on multiple matters. A fact finder could not infer, from this record, that Defendants prevented Plaintiff from prosecuting or interfered with Plaintiff's ability to prosecute a non-frivolous legal

claim he is entitled to litigate from prison.[14]  *Christopher v. Harbury*, 536 U.S. 403, 416 (2002) ("Like any other element of an access claim, the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant.").  Absent a showing of actual injury, he cannot claim "a violation of his fundamental right of access to the courts."  *Boivin v. Black*, 225 F.3d 36, 43 n.5 (1st Cir. 2000).

### 2.    *Incoming mail*

Plaintiff alleges Defendants unlawfully opened his incoming legal mail when he was not present.  The allegations implicate both the right to access the courts and the right to preserve confidences in incoming legal mail ("privileged mail").

Insofar as Plaintiff asserts a claim of interference with his ability to access the courts, Plaintiff must demonstrate evidence of harm to a nonfrivolous legal claim.  Because Plaintiff has not presented any evidence as to the nature of the underlying claim that he has been unable to prosecute or the harm that he has suffered as the result of Defendant's alleged conduct, Plaintiff cannot sustain his access to court claim.

Plaintiff's remaining incoming mail claim is based on his contention that Defendants opened his legal mail outside his presence.  In his pleadings, Plaintiff asserted that Defendants opened the following legal mail outside his presence:

---

[14] The Supreme Court has explained that its precedent, i.e., *Bounds*, "does not guarantee inmates the wherewithal to transform themselves into litigating engines …." *Casey*, 518 U.S. at 355.  Rather, "[t]he tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.  Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id.*

<u>Court mail</u>

October 13, 2016 – mail from this Court enclosing a court order, which mail Plaintiff never received, regarding condition of confinement claim.  (ECF No. 46 ¶ 64.)

December 6, 2016 – mail from the "Hancock County Court" regarding conditions of confinement issues, read out loud to Plaintiff but not provided to him.  (*Id.* ¶ 82.)

December 8, 2016 – mail from this Court regarding this case. (*Id.* ¶ 88.)

<u>Private legal aid mail</u>

October 19, 2015 – Maine Volunteer Lawyers Project regarding family matter civil case.  (ECF No. 31-1 at 4.)

<u>Agency mail</u>

November 24, 2015 – Maine Human Rights Commission regarding "future condition of confinement claims, which was heavily taped closed."  (*Id.*)

November 24, 2015 – Office of Program Evaluation and Government Accountability, regarding attempts to obtain legislative sponsorship for a review of conditions of confinement issues.  (*Id.*)

January 31, 2016 – Office for Civil Rights regarding complaint of discrimination. (*Id.* at 6.)

May 22, 2016 – Federal Investigative Services regarding conditions of confinement issues.  (ECF No. 46 ¶ 5.)

August 3, 2016 – Secretary of State Matthew Dunlap regarding. request to obtain legal materials.  (*Id.* ¶ 34.)

September 25, 2016 – Commissioner of the Department of Public Safety regarding condition of confinement issues.  (*Id.* ¶ 52.)

September 25, 2016 – City of Rockland Chief of Police regarding condition of confinement issues.  (*Id.*)

November 21, 2016 – State Fire Marshal regarding conditions of confinement issues.  (*Id.* ¶ 77.)

December 1, 2016 – Commissioner of the Department of Environmental Protection regarding conditions of confinement issues.  (*Id.* ¶ 83.)

December 5, 2016 – Director of the Law and Legislative Reference Library regarding request for legal materials concerning conditions of confinement litigation.  (*Id.* ¶ 83.)

December 6, 2016 – State Auditor regarding conditions of confinement issues.  (*Id.* ¶ 80.)

December 6, 7, or 8, 2016 – Chief of Police, Rockland Police Department regarding conditions of confinement issue.  (*Id.* ¶ 87.)

December 27, 2016 – Knox County Sheriff Department regarding state district court proceeding containing court summons.  (*Id.* ¶ 90.)

<u>Other</u>

March 29, 2016 – Center for Constitutional Rights regarding request for assistance with conditions of confinement issues.  (ECF No. 31-1 at 7.)

May 20, 2016 – Child and Family Services regarding pending civil matter.  (ECF No. 46, ¶ 5.)

August 25, 2016 – mail from Plaintiff's family containing legal materials (case law and court rules), which "mailroom staff refused to give" to Plaintiff.  (*Id.* ¶ 43.)

### a.  Court mail

Although the Department's policy appropriately includes mail from a judge, court clerk, or court within the concept of legal mail, courts have concluded that claims based on the opening of such mail are presumptively not actionable because "[w]ith minute and irrelevant exceptions all correspondence from a court to a litigant is a public document, which prison personnel could if they want inspect in the court's files."  *Keenan v. Hall*, 83 F.3d 1083, 1094 (9th Cir. 1996) (quoting *Martin v. Brewer*, 830 F.2d 76, 78 (7th Cir. 1987)); *cf. Boswell v. Mayer*, 169 F.3d 384, 389 (6th Cir. 1999) (suggesting that inmate

mail from a court would be protected only if it contained sensitive or confidential documents). The fact that Plaintiff received mail from the courts that was previously opened, or was read to him by a member of staff, does not establish a constitutional violation. Furthermore, the mere fact that Plaintiff failed to receive court mail is not actionable absent evidence of harm to his legal interest in pending litigation. As explained above, Plaintiff has failed to present any evidence of harm.

### b. Maine Lawyers' Project mail

Correspondence from criminal defense counsel has a special status. *Mangiaracina v. Penzone*, 849 F.3d 1191, 1197 (9th Cir. 2017) (collecting cases, and observing that even a single incident of improper inspection of attorney mail can rise to the level of a constitutional violation). Attorney mail regarding a civil matter is also entitled to protection, given the importance of attorney–client confidences. *Hayes v. Idaho Corr. Ctr.*, 849 F.3d 1204, 1210 (9th Cir. 2017). In civil matters, however, a prisoner must demonstrate more than isolated violations to establish a constitutional violation. *Id.*; *Ahlers v. Rabinowitz*, 684 F.3d 53, 64 (2d Cir.), *cert. denied*, 568 U.S. 944 (2012) (inmate must show that prison officials "regularly and unjustifiably interfered with the incoming legal mail."); *Merriweather v. Zamora*, 569 F.3d 307, 317 (6th Cir. 2009) (allegations describing "two or three pieces" of "properly labeled" attorney mail "opened in an arbitrary or capricious way" is sufficient to state a claim). Given the special treatment accorded by many courts to mail sent by criminal or civil counsel, the long-established practice is to preserve the prisoner's interest in confidential communication by opening properly identified legal mail from counsel in the presence of the prisoner. *Wolff v.*

*McDonnell*, 418 U.S. 539, 576–77 (1974); *Am. Civil Liberties Union Fund of Michigan v. Livingston Cty.*, 796 F.3d 636, 643 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 1246 (2016). The record lacks any evidence to suggest that the letter Plaintiff received from the Maine Volunteer Lawyers' Project involved communications subject to attorney–client privilege.[15]

### c. Government agency mail

Courts have held that correspondence with attorneys general, prosecutors, elected officials, and governmental agencies can implicate the right of prisoners to access the courts or otherwise to petition the government for redress of grievances, and have expressed concern that opening and reviewing the content of such mail could "chill" access to justice. For example, in *Muhammand v. Pitcher*, 35 F.3d 1081, 1083 (6th Cir. 1994), the Sixth Circuit cited a number of cases in which courts concluded that mail from governmental entities involved in the administration of justice should be handled like legal mail because prisoners who believe their legal mail has been reviewed – even if it has only been opened and inspected for contraband – will be less inclined to seek assistance. While the indiscriminate opening of mail sent to prisoners by government agencies could have a chilling effect on a prisoner's access to justice, courts have recognized that mail from a state attorney general (i.e., a state's chief law enforcement official) – like mail from counsel

---

[15] Given that the Maine Volunteer Lawyers' Project (VLP) ordinarily facilitates legal representation, but does not provide legal representation, one could reasonably conclude that Defendants did not deprive Plaintiff of his right to maintain the confidentiality of communications received from counsel. *See, e.g.*, *Sallier v. Brooks*, 343 F.3d 868, 875 (6th Cir. 2003) (holding that incoming mail from the American Bar Association was not privileged legal mail for two independent reasons, including that the ABA is not in the business of providing direct services to clients). Regardless of VLP's relationship with Plaintiff, Plaintiff has presented no evidence that would support a determination that the communication constituted privileged mail.

– can be opened without the prisoner present where the mail has not been labeled as containing confidential communications. *Boswell v. Mayer*, 169 F.3d 384, 388 – 89 (6th Cir. 1999) (citing *Wolff*, 418 U.S. 576 – 77).[16]

The record reflects that Plaintiff received previously opened mail from the MHRC, OPEGA, the Office for Civil Rights, Federal Investigative Services, Secretary of State Matthew Dunlap, the Commissioner of the Department of Public Safety, the City of Rockland Chief of Police, the State Fire Marshal, the Commissioner of the Department of Environmental Protection, the Director of the Law and Legislative Reference Library, the State Auditor, the Chief of Police of the Rockland Police Department, and the Knox County Sheriff's Department. Under the Department of Corrections' written mail policy, most of this mail qualifies as privileged mail, and the Department does not require that incoming mail from such sources be labeled as privileged or confidential to be treated as such. (Policy 21.2, Procedure D, §§ 1, 11, ECF No. 94-2.)

A claim is potentially actionable where incoming legal mail was "with some regularity" opened outside of a prisoner's presence. *Gallant v. Delahanty*, 43 F.3d 1456, 1994 WL 697283, at *2 (1st Cir. 1994 (per curiam table opinion).[17] Even if the mail is

---

[16] In *Boswell*, the Sixth Circuit considered a policy designed to address the fact that attorney general mail to prisoners commonly encloses copies of public record pleadings filed in court. 169 F.3d at 389 – 90. In *Brewer v. Wilkinson*, 3 F.3d 816, 825 (5th Cir. 1993), the Fifth Circuit acknowledged that the rule it once considered "compelled" was "no longer," given *Turner* and *Thornburgh*, and that based on the reasonableness rule of *Turner* "violation of the prison regulation requiring that a prisoner be present when his incoming legal mail is opened and inspected is not a violation of a prisoner's constitutional rights." *Id.*, *cert. denied*, 510 U.S. 1123 (1994).

[17] In 1994, when the panel issued *Gallant*, the screening language of 28 U.S.C. § 1915 called for sua sponte dismissal of frivolous claims. In effect, the *Gallant* panel concluded that the allegations in the complaint were not frivolous, and that they might state a claim if amended.

opened outside the prisoner's presence with "some regularity," a constitutional deprivation has not occurred where the opening of the mail was "reasonably related to a legitimate penological interest." *Thornburgh v. Abbott*, 490 U.S. 401, 409 (1989) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). "[S]uch a standard is necessary if 'prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations.'" *Turner*, 482 U.S. at 89 (quoting *Jones v. N. C. Prisoners' Union*, 433 U.S. 119, 128 (1977)).

Defendants have explained that they do not consider agency mail to be privileged unless the name of a particular agency official is included in the return address. (DSMF ¶ 9.) According to Defendants, the practice was developed to distinguish between ordinary agency mail and agency mail likely to contain privileged communications. This approach is not unlike the approach adopted by the Bureau of Prisons with respect to legal mail from an attorney. Federal regulations provide that mail from a law practice is not privileged unless it bears the name of the attorney who sent the mail, with the representation that the person sending the mail is an attorney, and an additional mark identifying the mail as "Special Mail – Open only in the presence of the inmate." 28 C.F.R. § 540.19.

Regardless of the reason for the Department's policy, Plaintiff's claim fails because the record lacks any evidence from which a fact finder could conclude the contents of the envelopes contained privileged information. Because those who sent the mail were not attorneys or were not attorneys acting in an actual or potential representative capacity, there is no presumption that the communications had privileged or confidential status. In fact, even when communications from counsel are at issue, some courts have required a showing

that the communication was privileged or confidential. *Miller v. Spencer*, No. 1:12-cv-10504, 2014 WL 957743, at *9 (D. Mass. Mar. 11, 2014) (granting summary judgment to defendants despite opening of package from counsel, where the communication did not implicate the plaintiff's legal rights or otherwise concern confidential matters).[18]

Without evidence that the envelopes contained privileged information, the concerns about the effect of opening incoming mail are mitigated. A prisoner's belief that someone might have read his or her mail would not have any greater chilling effect on the prisoner's exercise of his or her rights than would the prisoner's knowledge that some prison officials are aware that he or she is corresponding with the agency in the first place. *See, e.g.*, *Kaufman v. McCaughtry*, 419 F.3d 678, 686 (7th Cir. 2005) (affirming grant of summary judgment where the prisoner plaintiff never "described the contents in any manner sufficient to allow the district court to conclude that the mail was privileged" and it was "undisputed that no attorney from any of the[]organizations [in question] ever represented Kaufman in any capacity"); *Sallier v. Brooks*, 343 F.3d 868, 874 (6th Cir. 2003) ("Not all mail that a prisoner receives from a legal source will implicate constitutionally protected legal mail rights. Indeed, even mail from a legal source may have little or nothing to do

---

[18] The record also does not include any facts from which a fact finder could conclude the content of the envelopes involved non-frivolous legal matters. Courts in this Circuit have recognized in the First Amendment context that speech that advances a frivolous claim does not warrant constitutional protection. *See, e.g.*, *Dixon v. Int'l Bhd. of Police Officers*, 504 F.3d 73, 86 (1st Cir. 2007) (baseless claims do not come within the protection of the First Amendment); *McKenney v. Farrinton*, No. 2:16-cv-00630-JAW, 2017 WL 825280, at *4 (D. Me. Mar. 2, 2017), *report and recommendation adopted*, 2017 WL 1194190 (Mar. 30, 2017) (observing in the context of a prisoner's First Amendment retaliation claim that, "to be protected under the First Amendment, a grievance must not be frivolous" (citing, *inter alia*, *Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015)) ("filing a non-frivolous grievance is a constitutionally protected activity")).

with protecting a prisoner's access to the courts and other governmental entities to redress grievances or with protecting an inmate's relationship with an attorney."). In this case, Plaintiff has offered no evidence to support the conclusion that the envelopes from the agencies contained privileged communications.

### d. Other mail

Plaintiff also asserts he received the following opened mail: (a) a letter from the Center for Constitutional Rights; (b) a letter from Child and Family Services; and (c) mail from Plaintiff's family containing legal materials (case law and court rules) that the "mailroom staff refused to give" to Plaintiff. (*Id.* ¶ 43.)

#### i. Center for Constitutional Rights

The Center for Constitutional Rights is a private organization that engages in advocacy activity, including litigation. The record, however, lacks any facts that would support a finding that the mail included privileged information regarding a non-frivolous legal matter.

#### ii. Child and Family Services

Child and Family Services is a social services organization. The mere receipt of an opened article of mail from CFS does not demonstrate a constitutional violation.

#### iii. Family mail enclosing legal reference material

Plaintiff maintains that family members have sent him mail containing legal reference material (case law and court rules), and mail room staff treated the material as contraband and withheld it from him. Plaintiff's right to receive mail in prison is subject to reasonable restriction based on legitimate penological considerations, and courts have

upheld regulations that impose restrictions on the receipt of legal reference materials from non-legal sources like family and friends. *Weiler v. Purkett*, 137 F.3d 1047, 1050 (8th Cir. 1998). Plaintiff has failed to establish that the opening of the mail interfered with his ability to assert a non-frivolous legal claim concerning his sentence or the conditions of his confinement.

## Conclusion

Based on the foregoing discussion, I recommend that the Court grant Defendants' motion for summary judgment. (ECF No. 93.)

## NOTICE

  A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

  Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 13th day of December, 2018.